# CHARLESTON.

### STURM *v.* McGUFFIN.

### Decided December 21, 1900.

48 59.
51 498
52 380

1. EQUITY—*Answer of Third Party.*

    A petition filed in a chancery suit by a stranger to it, in which he or his rights are not mentioned, setting up matter not mentioned in the bill, making no parties, containing no prayer for relief, though its matter is in opposition to the bill, is improperly admitted as his answer, as if a defendant, and it is error to pronounce a decree resting alone upon such petition for its basis. (pp. 596, 597).

2. ORAL CONTRACT—*Married Woman.*

    . An oral contract by a married woman for the sale of her land cannot be specifically enforced under the doctrine of part performance. (p. 600).

Appeal from Circuit Court, Barbour County.

Bill by Isaac Sturm against Ann R. McGuffin. Peter G.

Poling intervened.    Judgment dismissing bill, and plaintiff appeals.

*Reversed.*

J. HOP WOODS, for appellant.

W. T. ICE, for appellee.

BRANNON, JUDGE:

Isaac Sturm filed a bill in chancery in the circuit court of Barbour County against Ann R. McGuffin and others having for its object a sale of the life estate of Ann R. McGuffin to pay the lien of a judgment in favor of Sturm against said McGuffin, which life estate was created by a conveyance from Samuel McGuffin of a tract of land to Ann R. McGuffin for life, with remainder to Mary Catherine Poling and Jane Amanda Poling. Peter G. Poling intervened in this suit by filing a petition setting up that Ann R. McGuffin had orally sold to him and Jonas J. Poling the said life estate, and that this sale ante-dated Sturm's judgment, and that consequently the life estate could not be sold therefor. This petition prayed that it might be taken as an answer of Poling to the bill. That petition made no parties, and prayed no relief, but it did assert the non-liability of the land to Sturm's judgment. Ann R. McGuffin filed an answer to the petition denying the sale by her of her life estate to the Polings. The case resulted in a decree dismissing Sturm's bill, from which decree he has appealed to this Court.

Sturm's counsel insists that his objection made to Poling's petition, endorsed thereon, and overruled by the court, was a valid objection, that is, that it was improper to file the petition, and that its allegations are insufficient to tender or raise an issue. I think this position well taken. There was not a thing in the bill touching any right of Poling to this life estate, nor was Poling a party to it—the suit was altogether foreign to that claim of Poling. It was error in the court to proceed upon that petition to decree. The court should have allowed it to be filed, as a suggestion to the plaintiff and the court that there was a claim of title in Poling adverse to Sturm's claim, and thus suggested the filing of an amended bill setting that claim up and making Poling a party. The court should have required the plaintiff to amend his bill. Perhaps we should say that

fault lies at the door of the plaintiff for not amending his bill upon the suggestion of that petition; but be this as it may, the court should not have proceeded to enter that decree upon that petition. It was irregular practice. It did not bring that contestation into the case properly under equity practice. *Shinn* v. *Board,* 39 W. Va. 497. Another objection to the action of the court in accepting that petition as an answer, as if there could be an answer by a stranger to the case introducing matter mentioned first in the answer, is that it makes no parties and contains no prayer for relief. It cannot be treated as an answer calling for affirmative relief, because filed by a stranger; but viewed even as such it is bad, because it prays nothing against anybody, has no parties, has no prayer. *Vance Shoe Company* v. *Haught,* 41 W. Va. 276; *Harrison* v. *Brewster,* 38 W. Va. 294; *Goff* v. *Price,* 42 *Id.* 384. If you treat that petition as a proper practice, which you cannot do, in itself it requires a strain to make it good. It relies on an oral sale of real estate. It does not give date of sale, circumstances of sale, legal, definite certainty, as it must do. *Gallaher* v. *Gallaher,* 31 W. Va. 9. Especially it does not directly say that Ann R. McGuffin did, under and in execution of that contract, deliver actual possession, which the pleading must do under that Gallaher case and all other cases on the subject. It does say that Poling took possession, but does not say that delivery of possession was made by Mrs. McGuffin; it does not make that allegation definite, though we might, by strained intendment, infer it. So, I think it was error to receive and act upon that petition as a basis for the decree that was rendered, implying that Poling had right to that land as against Mrs. McGuffin and Sturm; in in other words, was entitled to a specific performance of the contract. Who will say that that petition was sufficient to warrant a decree of specific performance against Mrs. McGuffin? Yet that is the effect of the decree. If an amended bill has been filed, an answer from Poling calling for exemption from Sturm's judgment of the land and for a deed from Mrs. McGuffin would have been the proper answer, and this brands this petition as insufficient.

So much for pleadings. Next as to merit. Putting Poling's petition and evidence together we may gleam, not very definitely, that there were two judgments against Samuel McGuffin, which threatened the land conveyed by him to Ann R. McGuffin for

life, with remainder to her daughters, Mary Catherine Poling
and Jane Amanda Poling, the wives of Peter G. Poling and
Jonas J. Poling, and that Ann R. McGuffin told Peter G. Poling
and Jonas J. Poling that if they would pay those judgments,
they might have the land, and that they did, under this under-
standing, pay the same, and took possession of the land, and
thus became entitled to it.   There was no writing to evidence
this contract.   Ann R. McGuffin upon the witness stand flatly
denies it—denies the contract of sale, denies the delivery of pos-
session under any contract.   The two Polings differ as to the
date of this understanding.   It was away back in 1883 or 1884.
If the Polings were to ask specific performance of this oral con-
tract, would a court of equity give it to them after so long a
time with no excuse for the delay from 1883 to 4th June, 1898, the
date of Poling's petition?   If there was such a contract, why was
it not reduced to writing, why not carried into deed in so many
years?   Again, when the Polings paid those judgments away
back many years they took assignments of them.   Why would
they take any assignments if they were in fact paying them
under a contract of sale?   In 1897, Ann R. McGuffin sued Peter
G. Poling for rent of this land.   The justice thought there was
no jurisdiction before him for rent, but tried the suit for the
price of a cow and colt, and Mrs. McGuffin swears that in that
suit Poling claimed an offset for work done upon the land, and
Poling does not deny this.   If it was Poling's land, why this
off-set?   It does not appear that the Polings ever were together
when any such contract was made with Mrs. McGuffin.   Peter G.
Poling as a witness was asked to state the contract about paying
the debts and taking the life estate, and he answered, "We told
her we would pay them debts, and she said it was all right."
He was then asked, "What was that she said was all right, when
you told her you would pay the debts—what did she mean?"
He answered, "I suppose she meant she would give the land up
to pay them debts."  ˙How very indefinite this word "suppose"
makes the matter.   How is that evidence of a specific, definite,
contract of sale such as the law requires?   And this is Poling
himself speaking, and I say, what will fully appear from his
examination, which I cannot here detail, that he had to be
forced by repeated questions to get from him enough to frame an
appearance of a contract.   But it will be asked why, if there was

no such contract, did the Polings pay the debts? The answer is that those debts would sell, not only the life estate of Mrs. McGuffin, but also, what was more serious to the Polings, the remainder in fee belonging to their wives. That moved them to pay those judgments, not the purchase of the life estate. The remainder in fee justly owed the bulk of those judgments, the life estate but little. Again, as stated above, we cannot tell whether this alleged purchase was made by one or both of the Polings, for they never were together with Mrs. McGuffin when any purchase was made. Peter G. Poling says that he thinks Mrs. Sturm was present, but she denies it under oath, and says she heard no contract. In 1897 Peter G. Poling requested Sturm to purchase for him Mrs. McGuffin's life estate. So Sturm swears and Poling does not deny it. Why did he want to purchase, if years before he had purchased? But it will be asked why is Poling in possession? Mrs. McGuffin is an old woman of eighty-two years. She remained on this land some time after her husband's death, and then went to live with her son-in-law, Jonas Poling, and remained there five years, when, as Poling says, "She got very unruly and I told her that she would have to behave herself or leave there." Then she departed. Now, she says that she was old and left the farm with her son-in-law, Peter G. Poling, to make out of it what he could. What more natural than to let her son-in-law have it, when she was old and decrepit, especially as his wife owned half of the remainder, and he owned the other half by conveyance from Jonas Poling and wife? So, we can readily explain Poling's possession on another reasonable theory than that of this alleged purchase. The truth is there is no certain, definite, evidence of a definite contract of sale. Chancery does sometimes enforce oral contracts for the sale of land, but does so with great caution, as it ought to do. It requires the proof to establish the contract by a clear preponderance of evidence, and if the evidence is conflicting, and it is not clear that a contract was made in fact, the court should dismiss the bill. It must appear that the contract is certain and definite in terms, and that the possession was delivered under and in persuance of it, and also that the contract has been so far executed that a refusal to complete it would operate as a fraud on the purchaser and place him in a situation in which he cannot be adequately compensated in damages. *Gallaher* v. *Gallaher,* 31 W. Va. 9; *Rosenour* v. *Rosenour,* (35 S. E. 918), 47 W. Va. 534.

The evidence in this case does not come up to the standard. Poling did very little improvement on the land, and that we may ascribe as done for the benefit of his own and his wife's interest in it, and the little demand, if any he has, against the old lady McGuffin is compensable in money.

There is another objection against the decree. That oral contract, if ever made, was undeniably made during the life-time of James McGuffin, then husband of Ann R. McGuffin. That oral contract was void, because made by a married woman. *Rosenour* v. *Rosenour*, 47 W. Va. 534, (35 S. E. 918). It could not be enforced. True, if after the death of the husband Mrs. McGuffin had renewed this contract, or if it were proven with definiteness that she delivered possession under the antecedent contract, it would do; but the possession is explainable on other grounds, as above stated; and besides, there is no distinct evidence of delivery of possession by her in execution of the contract. She solemnly denies it under oath. The evidence is conflicting and at best uncertain as to this. Now, to make that void contract valid by subsequent ratification and delivery of possession the evidence should be full and distinct and unconflicting. I am clear that Poling has not established his right to the life estate under the alleged oral contract. We therefore reverse the decree and remand the case for further proceedings.

*Reversed.*